UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ANTHONY STEVENS,

                                Petitioner,

                -against-

THOMAS GRIFFIN, Superintendent of
Eastern Correctional Facility,


                                Respondent.

-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:__  3/4/2014

13-CV-05170 (RJS)(SN)

**REPORT AND
RECOMMENDATION**

SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE RICHARD J. SULLIVAN:

       Before the Court is petitioner Anthony Stevens's writ of *habeas corpus*, pursuant to 28

U.S.C. § 2254, to set aside his conviction in state court on the grounds that, due to his

representation by attorney Carlos Perez-Olivo, (1) he was denied his right to a trial attorney free

from conflicts of interest, and (2) he was denied his right to effective assistance of counsel.

Because the Court finds that the state courts' denials of these claims were neither contrary to, nor

an unreasonable application of, clearly established federal law, the Court recommends that

Stevens's petition be DENIED.

## BACKGROUND

### I.       Procedural Overview

       After a jury trial, the petitioner Anthony Stevens ("Stevens") was convicted on February

10, 2006, of Burglary in the Second Degree, N.Y. Penal Law ("Penal Law") § 140.25(2).

Because he was a second violent felony offender, Stevens was sentenced to a prison term of 15

years, followed by five years of post-release supervision. Stevens filed two unsuccessful motions under N.Y. Crim. Proc. Law ("CPL") § 440.10 to vacate his judgment of conviction on the ground of ineffective assistance of counsel. On October 13, 2011, Stevens's conviction was unanimously affirmed by the Appellate Division of the New York Supreme Court, First Department (the "Appellate Division"). The New York Court of Appeals denied leave to appeal on May 7, 2012. Stevens filed this counseled petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on July 24, 2013, alleging that he is being held in state custody in violation of his federal constitutional right to have effective, conflict-free assistance of counsel at trial. On November 20, 2013, the Honorable Richard J. Sullivan referred this matter to me for a report and recommendation.[1]

## II.    Factual Background

Stevens's *habeas* petition arises from his conviction for the burglary of an apartment building located at 150 West 87th Street, New York, New York. He is serving his sentence in the Eastern NY Correctional Facility in Ulster County, New York. The following facts are derived from the records of Stevens's pre-trial proceedings, trial, and post-conviction appeals and motions.

---

[1] Stevens submitted a print appendix to his petition but did not file it on ECF. With his opposition, the respondent electronically filed the declaration of Paul B. Lyons, attaching the hearing and trial transcripts and 19 exhibits, including all those contained in the appendix submitted by Stevens. All record citations in this report and recommendation are to the documents filed by the respondent, which are located at Docket Numbers 8-1 through 8-8.

### A.    Stevens's Charged Criminal Conduct and Arrest[2]

On Sunday, December 12, 2004, at 4:34 a.m., Stevens and his co-defendant, Frank

McClain ("McClain"), entered the lobby of the apartment building located at 150 West 87th

Street in Manhattan. A surveillance camera mounted in the lobby recorded McClain and Stevens,

who was wearing a distinctive hat and shoes, enter the lobby and make two trips to and from the

basement, where the building superintendent Naser Pepic's ("Pepic") storage room/workshop

was located. Stevens carried a white bag and, after the second trip to the basement, McClain

returned with an armful of items, including a power drill that can be identified in the videotape

from its dangling cord.

Pepic watched the surveillance videotape after he noticed that the metal lock on his

storage room door was bent. After watching the videotape and realizing that his power drill was

missing, he called the police. Detectives Jay Sias ("Sias") and Kenneth Clancy ("Clancy")

responded to the call later that day, viewed the surveillance videotape, and conducted an

investigation. On December 30, 2004, Sias was on patrol with Sergeant Gavigan ("Gavigan")

when he recognized Stevens, who was standing on the street and wearing the same distinctive hat

and shoes that he wore in the surveillance videotape. Sias approached Stevens, asked him his

name, and displayed a picture of McClain while asking if Stevens recognized the man pictured.

Stevens replied, "that is my boy Frankie." (Transcript ("T.") at 236.)[3] Sias arrested Stevens,

---

[2] The parties in their *habeas* briefs largely agree on the underlying facts of this case. The Court notes that
the narrative provided in this Subpart of the burglary and the activity at the police station primarily
reflects the testimony of the police officers and the documentary evidence presented by the prosecutor,
which are the bases of the jury's guilty verdict. The partially conflicting narrative of these events to which
Stevens testified at trial and which the state courts found not to be credible is summarized in Part II.C.2,
*infra*.

[3] "Transcript" or "T." in this report refers to volumes 1 and 2 of the trial transcript, which are located at
Docket Number 8-1, ECF pages 4 through 278, and Docket Number 8-2, ECF pages 1 through 240,

seizing his hat and a tool he discovered in Stevens's pants pocket, which Sias described as "a blade screwdriver without the handle, like a small chisel" (the "screwdriver"). (T. at 236-37.)

Sias took Stevens into custody and drove him to the police station, where Stevens told Sias that he would waive his Miranda rights. Stevens signed a Miranda waiver form. When Sias asked Stevens about McClain, Stevens replied that McClain "likes to steal things." (T. at 236.) Stevens then told Sias that he wanted to make a statement and have Sias write it down. In his statement, Stevens said that McClain asked him, "do you want to make some money," after which he and McClain entered the apartment building, McClain took the drill, and the two men sold it immediately thereafter to a man who worked at a nearby store. (T. at 247-48.) Stevens stated that while McClain "went into the elevator" and "came back with a drill," "I waited in the lobby." (T. at 248.) Sias transcribed Stevens's statement on the back of the paper containing the Miranda warnings and Stevens's signed waiver. Under the transcribed statement, Sias also noted that, upon seeing a flyer on the precinct wall with a picture still from the surveillance videotape, Stevens said, "hey, that is a poster of me right there." (T. at 384.) Stevens, Sias, and Gavigan all signed the written statement.

On January 28, 2005, the New York County Grand Jury indicted Stevens and McClain on the charge of burglary in the second degree, Penal Law § 140.25(2).[4]

---

respectively. Docket Number 8-1 also contains the pre-trial proceedings transcript, ECF pages 1 through 3; and Docket Number 8-2 also contains the sentencing transcript, ECF pages 241 through 258. The Court does not cite to the pre-trial proceedings transcript in this report, and citations to the sentencing hearing transcript are designated as "Sentencing Transcript" or "S.T." Page citations the transcripts refer to the internal pagination for each transcript, not the ECF pagination that is continuous throughout the electronically filed document.

[4] Stevens was indicted on burglary in the second degree, as opposed to the less severe charge of burglary in the third degree, because the apartment building at issue is residential and thus defined as "a dwelling." Penal Law § 140.25(2).

### B.     Pre-trial Proceedings

On February 22, 2005, Stevens pled not guilty in New York County Supreme Court to the charge of burglary in the second degree. On April 22, 2005, the trial court ordered suppression hearings on the motion made by Stevens's initial attorney, David Krause, to (1) suppress Stevens's statements made to the police, pursuant to People v. Huntley, 15 N.Y.2d 72 (1964) (regarding the admissibility of statements made to police) and Dunaway v. New York, 442 U.S. 200 (1979) (regarding the existence of probable cause to make a lawful arrest), and (2) suppress the hat and the screwdriver that Sias seized from Stevens, pursuant to Mapp v. Ohio, 367 U.S. 643 (1961) (regarding the admissibility of physical evidence obtained as a result of an unreasonable search and seizure). Before the suppression hearings were held, Stevens retained new counsel, Carlos Perez-Olivo ("Perez-Olivo").

The parties, including Stevens's co-defendant McClain, appeared before Justice Maxwell Wiley on December 5, 2005. Justice Wiley indicated that the prosecutor had not yet made any plea offers. He also reminded the parties that, because Stevens and McClain are charged with a Class C violent felony, there is a statutory minimum sentence, and any plea offer below that minimum would require the consent of the district attorney.

Stevens's and McClain's trials were severed and, on December 6, 2005, Stevens appeared for the suppression hearing. Perez-Olivo, however, informed the court that Stevens was waiving the suppression hearing as to all grounds cited in his initial counsel's motion. Perez-Olivo provided several reasons for waiving the hearing, stating, "we wouldn't prevail in the motion anyhow"; Perez-Olivo "would bring . . . up" during the trial any statements Stevens made to the police anyway; and Stevens would admit that the hat seen in the videotape and the screwdriver seized by Sias during the arrest were on his body during the alleged burglary. (T. at

5

2-5.) Perez-Olivo also stated that he would stipulate to the admission of fingerprints, which Detective Clancy had recovered from the basement storage room and the police evidence unit had identified as belonging to Stevens. Perez-Olivo's principal rationale for waiving the hearings and stipulating to admission of the fingerprints was that his defense was "not that [Stevens] was not there, but that he did not go in with the intent to burglarize." (T. at 4.)

On December 7, 2005, the court held a preliminary hearing, pursuant to People v. Sandoval, 34 N.Y.2d 371 (1974), to determine the extent to which the assistant district attorney, Shannon Lucey (the "prosecutor"), could cite Stevens's prior convictions for the purpose of witness impeachment if Stevens chose to testify in his defense. The prosecutor sought to inquire into Stevens's four drug-related felony convictions and one attempted robbery felony conviction, in addition to the different aliases and birthdates Stevens had used in the past. The court ruled that, as to Stevens's most recent felony conviction in November 2000, the prosecutor could ask questions to elicit the name of the felony (sale of a controlled substance in the third degree), the fact that it was a felony, and whether it involved a sale of narcotics to an undercover officer, but could not ask about the location of the sale. With respect to Stevens's 1997 and 1990 convictions for sale or attempted sale of a controlled substance, and his 1990 conviction for attempted robbery, the court permitted the prosecutor to ask about the name of the felony and the fact that it was a felony, but prohibited any questions as to the underlying facts of the convictions. The court altogether precluded the prosecutor from asking about Stevens's 1986 felony conviction and any other felony or misdemeanor convictions that occurred before 1990. The court further ruled that the prosecutor could ask about one alias, which Stevens had used in connection with the 2000 conviction, but no others, and that the prosecutor could ask about the false birthdates only to the

extent Stevens used them in connection with any of the four felonies the court had ruled were permissible bases for impeachment questions.

### C.      The Trial

#### 1.      The Prosecution's Case

Stevens's trial commenced on December 7, 2005, before Justice Wiley. The prosecutor presented the facts discussed above, including testimony from Pepic, Clancy, and Sias. Perez-Olivo stipulated to the authenticity of the surveillance videotape, which the prosecutor entered into evidence and played for the jury during Pepic's testimony. Clancy testified as to the police investigation the day of the burglary. Next, the prosecutor entered into evidence and read to the jury a stipulation stating that, if certain officers in the Evidence Collection Unit were called to testify as experts, they would testify that the fingerprints recovered from the basement storage room were positively identified as belonging to Stevens. During Sias's testimony, the prosecutor introduced into evidence the hat and screwdriver seized from Stevens, the Miranda form and waiver signed by Stevens, and the back of the form containing Stevens's transcribed and signed statement, which Sias read to the jury.

Sias then began to testify that, when he brought Stevens to a holding cell after questioning him, he heard Stevens make a statement to another prisoner. When the prosecutor asked what Sias heard, Perez-Olivo objected. The court sustained the objection because the statement the prosecutor wished to introduce had not been noticed in the state's Voluntary Disclosure Form. The prosecutor asked the court to reconsider its ruling outside the presence of the jury and submitted cases in support of the state's position. The court discussed the cases, distinguished them from the proffered evidence at issue, and, after hearing argument from the prosecutor, decided that its ruling sustaining the objection, though a close decision, was correct.

7

The court warned, however, that "the defense is on notice of [the statement evidence] now, . . . so if the defendant does take the stand[, the prosecutor] can certainly cross examine him on it and certainly if he gives a certain response, [the prosecutor] may be allowed to call a witness in rebuttal to bring in evidence of [the statement]." (T. at 272.)

Perez-Olivo declined to cross-examine Pepic or Clancy. On cross-examination of Sias, Perez-Olivo first asked if Stevens was "very cooperative" and "forthright" and was in fact the one who pointed out to Sias that it was Stevens pictured on the flyer hanging on the precinct wall. (T. at 252.) Sias answered affirmatively. Next, Perez-Olivo asked, "would you agree as an experienced police officer" that Stevens's statement, "McClain liked to steal things," is a "pretty incriminating statement?" (T. at 252.) Sias agreed. Perez-Olivo then asked, "But it's not in the statement that he signed, correct?" to which Sias replied "No." (T. at 252.) Perez-Olivo had no further questions.

### 2.      Stevens's Case

Stevens presented his case beginning on December 14, 2005. Perez-Olivo called Stevens as the first of two witnesses. After establishing that Stevens was 41 years old and had two children, Perez-Olivo asked if Stevens had been convicted of attempted robbery and drug possession in 1990; Stevens answered affirmatively.[5] Perez-Olivo then asked, "Could you please tell the ladies and gentlemen of the jury what that conviction was about?" (T. at 282.) Stevens explained that he had been in a park with friends, drinking beer and "using drugs," when a man came by and traded Stevens and his friends his bicycle in exchange for drugs. (T. at 282.) The

---

[5] According to the transcript, Perez-Olivo and Stevens referred to this conviction multiple times as occurring in 1981. In their briefs, Stevens and the respondent both indicate that the year at issue was 1990. It is not clear that the other convictions about which Stevens testified at trial correspond to those discussed and ruled upon during the Sandoval hearing.

transaction "went sour" when it turned out that the bicycle belonged to the man's brother, a police officer, who arrived at the scene and arrested Stevens and his friends. (T. at 282.) Perez-Olivo then asked about a 1996 drug conviction, a 1997 drug conviction, and a 1999 drug conviction, each time asking Stevens to tell the jury the underlying facts of his crime. Stevens explained the circumstances of each arrest, including that he was "a full-fledged drug addict" in 1996, "still an addict" in 1997, and "got high and . . . got arrested while I was getting high" in 1999. (T. at 282-85.) Returning to the 1990 conviction, Perez-Olivo asked Stevens, "Did you use any force against [the police officer] when he came to request the bicycle?" (T. at 285.) Stevens replied, "I went to defend myself. I am a martial artist, I study Weng Chung and I defended myself . . ., and when he said he was a police officer though I stopped." (T. at 285.)

After questioning Stevens about his prior felony convictions, Perez-Olivo elicited testimony about the five years Stevens had spent in prison, during which time Stevens took various classes, attended drug rehabilitation courses, and earned a certificate in addiction counseling. Stevens testified that he now runs "an addiction peer group." (T. at 286-87.) Perez-Olivo also established that Stevens met McClain in December 2004 and that they began working together, removing garbage from commercial and residential buildings and performing similar tasks for various building superintendents. Stevens testified that, around that same time, he performed work for his friend, Robert Mazzaraco ("Mazzaraco"), at Mazzaraco's cottage. In the past, Stevens had performed assorted manual tasks at a bed and breakfast owned by Mazzaraco's family in the Hamptons in Long Island, New York.

Stevens's testimony as to the events of December 12, 2004, is as follows: After removing the garbage from a building on 96th Street and a grocery store on 94th street, Stevens and McClain went to the apartment building at 150 West 87th street to take the garbage from the

9

basement to the curb. Unable to get in through a gate, the two men went to the front door and rang the bell to be let inside. When there was no answer, McClain took his "afro comb and he put it to the door and went inside." (T. at 304.) The two men then took the elevator to the basement. They knocked on Pepic's door and various other doors, but received no response. The two men gathered all the garbage from the basement, including a pile of newspapers that Stevens put in a garbage bag, intending to sell them back to a newsstand. According to Stevens, this garbage bag of newspapers is the bag he can be seen carrying in the surveillance videotape. Stevens and McClain removed the bags of garbage and then removed a box of assorted "metal and wood garbage," including "the drill." (T. at 309.) Stevens and McClain then separated, with Stevens going to 86th street to sell the newspapers and McClain heading to 94th street to sell the drill.

With respect to his arrest on December 30, 2004, Stevens testified as to the following: After being arrested and brought to the police station, Stevens told either Sias or a second, unidentified officer, "I need to write a statement." (T. at 316.) Shortly thereafter, the officer handed him a piece of paper (presumably containing Stevens's statement) and said he wanted Stevens to sign it. When Stevens requested to read the paper first, the officer said, "it's nothing, it is everything you told me." (T. at 316.) According to Stevens, after the officer became angry and said "I am gonna lock you up," Stevens "signed the paper" "in order to not get [the officer] upset with me." (T. at 316-17.) Stevens then told the officer that there are "a few things in the paper that I didn't tell [you] that [you] wrote," to which the officer replied, "doesn't matter, it means the same thing." (T. at 317.)

After Perez-Olivo's direct examination of Stevens, the court excused the jury and told the prosecutor that, on cross examination, she may "inquire as to any of the underlying facts on any

of the convictions . . . based on the defendant's direct testimony." (T. at 320-21.) The prosecutor asked Stevens questions about his convictions at length and in detail, establishing that Stevens was convicted three times for selling cocaine; lied "for a plea bargain" in 1990; was too "high and intoxicated" during his 1997 arrest to remember the facts from that day; was too "drugged out" during his 1996 arrest to recall whether he lied about his date of birth; and was most recently convicted for selling cocaine near a school and for resisting arrest. (T. at 390-96.) The prosecutor also provided Stevens with his rap sheet to refresh his recollection, after which she continued questioning him about the facts of his felony convictions.

The prosecutor asked Stevens several questions as to why he would be removing the garbage at 4:30 on Sunday morning for Monday pick-up. Though Stevens testified that he went to the apartment building to remove the garbage for "that day's collection" (T. at 324), he appears to have been confused, as he shortly thereafter confirmed that "garbage goes out Sunday for Monday" and "[i]n that neighborhood [garbage is not collected on Sunday]" (T. at 326-27). Stevens testified that he was not aware of the city's policy that garbage is to be put on the curb only the night before collection day.

With respect to his questioning at the police station, Stevens testified on cross-examination that his purported signature on the Miranda form was in fact fake. (T. at 344-45, 48-49.) He also testified that he was never taken to a holding cell at the precinct after signing his statement and was never in a holding cell with another prisoner. The prosecutor then asked if it was Stevens's testimony that he was "never in a holding cell talking to another inmate telling them that the camera got you, that it is over?" (T. at 386-87.) Stevens denied having made that statement. During the prosecutor's rebuttal, Sias testified that he heard Stevens tell another prisoner, "[T]he camera in the lobby got me, it's over." (T. at 429.)

11

Finally, on Perez-Olivo's redirect examination, Stevens stated that, in the months leading up to trial, Perez-Olivo visited him "three, four times a week for four hours at a time." (T. at 402.) He further confirmed that he and Perez-Olivo would have conversations on the telephone and speak every time Stevens was in court.

Perez-Olivo called Mazzaraco as the defense's second and final witness. Mazzaraco testified that from December 16 to December 23, 2004, Stevens visited the cottage he was renting and helped him complete various tasks around the docks and marina. Perez-Olivo showed Mazzaraco a picture of the screwdriver Sias had seized from Stevens on December 30, 2004. Mazzaraco testified that the tool was a "cold chisel," a type of tool that he and Stevens had been using while working at the cottage. (T. at 409-10.)

### 3.      Verdict and Sentencing

On December 15, 2005, the jury convicted Stevens of burglary in the second degree. On February 10, 2006, Stevens, still represented by Perez-Olivo, appeared before Justice Wiley for his sentencing hearing. The prosecutor argued that Steven should be "sentenced to the maximum of 15 years. This was a burglary at 4:30 in the morning. Defendant testified and repeatedly lied under oath. Some lies he actually got caught on, under oath. And I ask the Court to take note of that, considering . . . you heard the trial." (Sentencing Transcript ("S.T.") at 7-8.) The prosecutor also stated that, "in light of what this case was all about, the repeated lies by the defendant on the stand, his long history, I again reiterate to the Court, I believe the maximum of 15 years is appropriate in this case." (S.T. at 10.)

Perez-Olivo then made his statement. He advised the court that Stevens "has spent most of his life in jail. He has a wife, he has two children. And yet he can't seem to help himself." (S.T. at 12.) Perez-Olivo added that Stevens "has a severe drug problem that controls his life."

12

(S.T. at 13.) Perez-Olivo also conceded some of the weaknesses in the defense's case and attempted to explain or minimize them. Stevens declined to make a statement.

Justice Wiley then issued the sentence:

I'm not going to repeat the arguments of counsel. I'll just say that the defendant has an extensive criminal history. I believe his guilt was proved well beyond any reasonable doubt at trial, and therefore, I believe he lied repeatedly on the stand, under oath . . . [M]y judgment is that the defendant must get the maximum. The sentence is 15 years determinate to be followed by 5 years post-release supervision.

(S.T. at 17-18.)

### D.    Stevens's First CPL § 440.10 Motion[6]

On December 22, 2008, Stevens, proceeding *pro se*, filed a CPL § 440.10 motion in the New York County Supreme Court before Justice Wiley seeking to have his conviction vacated on the ground that Perez-Olivo provided ineffective assistance of counsel during the trial. In the motion, Stevens relied on two significant events regarding Perez-Olivo that occurred after Stevens's conviction and sentencing: Perez-Olivo was disbarred in New York in August of 2006, and, in 2008, Perez-Olivo was convicted for the murder of his wife and sentenced to 25-years-to-life imprisonment.

Justice Wiley denied Stevens's motion on February 11, 2009, finding that Stevens "alleges no facts in support of these claims [of ineffective assistance of counsel]." (Ex. D at 94.)[7]

---

[6] CPL § 440.10 permits convicted criminal defendants to file a motion to vacate the judgment of conviction with the trial court on various grounds involving facts not reflected in the record and not known to the court at the time of the judgment. See CPL § 440.10(1)(a-h); People v. Saunders, 753 N.Y.S.2d 620, 622 (3d Dep't 2003).

[7] Citations to page numbers of exhibits refer to the ECF page numbers at the top-right corner of each page. The Court notes that most of the attachments to the Lyon declaration electronically filed by the respondent contain multiple exhibits, and several exhibits contain multiple documents, all with their own internal pagination, thus making citation to the ECF page numbers preferable for clarity.

Justice Wiley further found that Perez-Olivo's "performance at trial . . . was professional and competent," that there was "overwhelming evidence of the defendant's guilt," and that "the defendant's own testimony was patently false." (Ex. D at 95.)

On April 29, 2009, the Appellate Division denied Stevens's request for leave to appeal Justice Wiley's decision.

### E.   Stevens's Second CPL § 440.10 Motion

Stevens, now represented by counsel,[8] filed his second § 440.10 motion on June 22, 2010, claiming that his conviction should be vacated on the ground of ineffective assistance of counsel.[9] The motion consisted of a 41-page affirmation of one of Stevens's attorneys, Jan Hoth (the "Hoth Affirmation"), regarding her and her co-counsel's post-conviction investigation, which involved interviewing Stevens, Perez-Olivo (who was housed at Attica Correctional Facility at the time), and the trial prosecutor, among others; a 22-page memorandum of law; and various exhibits related to either Perez-Olivo's representation of Stevens or to Perez-Olivo's assorted legal troubles not involving Stevens. Stevens's motion relied on three theories argued under federal and state law: (1) Stevens was not "truly represented by 'counsel' in any true constitutional sense" because Perez-Olivo "was in reality a criminal whose primary purpose was to defraud vulnerable populations"; (2) Perez-Olivo's representation was deficient due to his

---

[8] Stevens filed his second § 440.10 motion through his counsel, Robert S. Dean of the Center for Appellate Litigation, whom the Appellate Division appointed on October 23, 2008, to represent Stevens on his direct appeal. Dean represented Stevens on his second § 440.10 motion and all subsequent matters, including this *habeas* petition. Unless otherwise noted, all references to Stevens's § 440.10 motion refer to his second, counseled motion.

[9] Stevens's second § 440.10 motion was filed after his direct appeal brief, discussed *infra*, but a court decision was issued as to the § 440.10 motion before one was issued on the direct appeal. Section 440.10 motions are justiciable while a direct appeal is pending where, like here, sufficient facts do not appear on the record with respect to the § 440.10 grounds such that those grounds could be adequately reviewed on direct appeal. See CPL § 440.10(2)(b).

conflicts of interest; and (3) Perez-Olivo's representation was intentionally deficient as part of his scheme to "swindle" Stevens's wife. (Ex. H at 46.)

Stevens alleged the following facts not contained in the record, facts on which he also largely relies in this *habeas* petition. Stevens's motion begins with a recounting of Perez-Olivo's 2000 disbarment in Puerto Rico and his past acts of defrauding various clients, leading to disciplinary proceedings in the Appellate Division's First Department that were ongoing during Stevens's trial. These disciplinary proceedings would conclude with Perez-Olivo's disbarment on August 3, 2006. See In re Perez-Olivo, 820 N.Y.S.2d 14 (1st Dep't 2006). Because Perez-Olivo knew that he would soon be disbarred and would face financial difficulties, he hired Stevens as a "chaser," meaning someone who solicits clients for a lawyer in exchange for a "finder's fee." (Ex. H at 54-55.) After agreeing to this arrangement, Stevens referred at least 10 prisoners to Perez-Olivo with the understanding that the 10% finder's fee for each referral would be used to offset the legal fees Stevens owed to Perez-Olivo. At some point after Stevens's conviction, Perez-Olivo told Stevens that he still owed legal fees and convinced Stevens and his wife, Maria Philips Stevens, to pay him $75,000, promising in exchange that he would secure Stevens's release on appeal.

The source of the $75,000 was the sale of Mrs. Stevens's house out of foreclosure, a sale which Perez-Olivo had allegedly facilitated while representing Stevens. Perez-Olivo never filed an appeal. According to Stevens, this was the first of several instances in which Perez-Olivo would defraud Mrs. Stevens. By promising to secure Stevens's release, Perez-Olivo convinced Mrs. Stevens to invest $40,000 in his "Venezuelan oil company" and to deposit her and her husband's savings of $167,000 into Perez-Olivo's escrow account under the rationale that he could protect it while Stevens was in prison. (Ex. H at 34-35, 95-97.) Altogether, Stevens

15

claimed that Perez-Olivo "swindle[d] Mrs. Stevens out of $160,000 following Mr. Stevens' conviction." (Ex. H at 56.)

Stevens referred multiple times in his motion to Perez-Olivo's 2008 conviction for the murder of Perez-Olivo's wife. Stevens argued, for example, that Perez-Olivo was "capable of doing anything for money[, as] fully evidenced by his conviction of murdering his wife for $900,000 in insurance proceeds." (Ex. H at 54.) Stevens also submitted as exhibits several documents and transcripts from Perez-Olivo's pre-trial proceedings. These exhibits, which contained the arguments set forth by Perez-Olivo's defense counsel to try to disprove a financial motive for the murder, support the claim that Mrs. Stevens deposited $40,000 into Perez-Olivo's bank account sometime before November 2006 and deposited at least $160,000 into Perez-Olivo's IOLA bank account in May 2006.

In addition to Perez-Olivo's trial decisions that appear on the record, Stevens cited the fact that Perez-Olivo did nothing to persuade him to accept a plea offer as evidence of Perez-Olivo's conflict of interest. The alleged facts regarding the plea offers are asserted in the Hoth Affirmation and are based on the post-conviction interviews with prosecutor Shannon Lucey; Robert Buckley, "Perez-Olivo's shadow during Mr. Stevens' trial"; David Krause, Stevens's initial attorney; Perez-Olivo; and Stevens. (Ex. H at 9-10.) The asserted facts are ambiguous and contradictory. According to the Hoth Affirmation, the prosecutor first offered Stevens a plea bargain of three years, which was either rejected by Stevens or retracted for being impermissibly low; then offered a five-year plea, which Stevens agreed to take, but which was also then retracted for being impermissibly low; and then either offered a plea bargain of seven years (according to Perez-Olivo) or twelve years (according to Stevens), which Stevens rejected. Buckley stated that Stevens refused to accept a plea offer higher than the three years initially

offered; Perez-Olivo stated that Stevens refused to accept a plea offer higher than the five years Stevens initially accepted; and Stevens stated he only remembered the 12-year offer and refused to accept it because of Perez-Olivo's promise that he would be acquitted.

Based on these alleged facts and the facts on the trial record, Stevens argued that Perez-Olivo intentionally "forfeited the trial" with the aim of keeping Stevens imprisoned, thus freeing Perez-Olivo to defraud Stevens's wife without interference, while at the same time undermining the credibility of Stevens and his wife, who would be dismissed as "bitter clients" angry about Stevens's conviction in any future action they might bring against Perez-Olivo to recover their money. (Ex. H at 46, 56.) Thus, Stevens argued, under the law of New York and authority established by the Court of Appeals for the Second Circuit, Perez-Olivo had a "*per se* conflict of interest," requiring an automatic reversal of Stevens's conviction. Alternatively, Stevens argued that his "chaser" arrangement with Perez-Olivo, and Perez-Olivo's involvement in the sale of Mrs. Stevens's house constituted an "actual conflict of interest" that rendered Perez-Olivo's assistance ineffective. In arguing that Perez-Olivo's trial representation was deficient, Stevens identified three primary alleged errors: (1) failing to conduct an adequate investigation, which would have revealed the weakness of Stevens's claim that he went to the apartment building to remove the garbage at 4:30 a.m. on a Sunday, well before garbage is legally allowed to be placed on the curb in New York City; (2) waiving the suppression hearing, through which Perez-Olivo could have at least learned about damaging evidence, such as the statement Stevens allegedly made to another prisoner in the precinct holding cell; and (3) opening the door on direct examination to the underlying facts of Stevens's prior felony convictions despite the court's ruling in the Sandoval hearing that the prosecutor could not inquire into these facts.

On December 1, 2010, Justice Wiley denied Stevens's § 440.10 motion, finding that Perez-Olivo's representation at trial was not ineffective under either the federal standard established by the U.S. Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), or the state standard established by the New York Court of Appeals in People v. Baldi, 54 N.Y.2d 137 (1981). Justice Wiley stated that none of Perez-Olivo's trial decisions, when taken either individually or collectively, "fell below an objective standard of reasonableness under prevailing professional norms." (Ex. J. at 23.) In addition, Justice Wiley found that, "while it seems that [Perez-Olivo] has engaged in a variety of unethical and illegal activities outside the parameters of this case, defendant has not shown any connection between those activities and his defense on these charges." (Ex. J. at 24.)

On January 5, 2011, the Appellate Division denied Stevens's request for leave to appeal Justice Wiley's decision.

### F.    Stevens's Direct Appeal

Stevens filed a counseled direct appeal of his conviction in the Appellate Division in March 2010, arguing that he was denied effective assistance of counsel under the federal Strickland standard and under the New York standard. As in his second § 440.10 motion, Stevens argued that Perez-Olivo committed three significant trial errors: waiving the suppression hearing, eliciting damaging information about Stevens's prior felony convictions despite the court's Sandoval ruling, and failing to conduct even a minimal investigation into the viability of Stevens's primary defense.

18

On October 13, 2011, the Appellate Division unanimously affirmed the judgment of conviction.[10] At the outset, the court stated,

> Defendant's ineffective assistance claims primarily involve matters outside the record concerning counsel's strategic choices (*see People v Love*, 57 NY2d 998 [1982]). Although defendant raised these claims in unsuccessful CPL 440.10 motions, defendant's motions for leave to appeal to this Court were denied (*see* CPL 450.15 [1]; 460.15). Accordingly, our review is limited to the trial record.

People v. Stevens, 930 N.Y.S.2d 877 (1st Dep't 2011).

Upon reviewing the record, the court found that Perez-Olivo provided Stevens effective assistance of counsel under both the federal and New York standards, and that, "given the overwhelming evidence of guilt, defendant has not shown a reasonable probability that any of his attorney's alleged errors or omissions affected the outcome of the trial or undermined confidence in the result." Id.

The New York Court of Appeals denied Stevens's application for leave to appeal on May 7, 2012.

### G.    Stevens's Federal *Habeas Corpus* Petition

Stevens filed his counseled petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on July 24, 2013. The respondent opposed Stevens's petition and filed his answer on October 17, 2013. The Court granted Stevens until January 6, 2014, to file a reply, but he has not done so. On November 20, 2013, the Honorable Richard J. Sullivan referred this matter to me for a report and recommendation.

---

[10] The respondent submits the Appellate Division's decision as Exhibit P, but only includes the first page of the two-page order. Stevens included the full decision in his petition index, which is not electronically filed. The citation for the decision is People v. Stevens, 930 N.Y.S.2d 877 (1st Dep't 2011).

**DISCUSSION**

**I.      Timeliness**

It is uncontested that Stevens's *habeas* petition is timely filed. The Antiterrorism and

Effective Death Penalty Act (the "AEDPA") requires a state prisoner whose conviction has

become final to seek federal *habeas corpus* relief within one year. 28 U.S.C. § 2244(d)(1)(A).

This one-year period serves the "well-recognized interest in the finality of state court

judgments." Duncan v. Walker, 533 U.S. 167, 179 (2001). A petitioner's judgment becomes final

90 days from the date the New York State Court of Appeals denies leave to appeal – i.e., after

the "period to petition for a writ of *certiorari* to the United States Supreme Court." Pratt v.

Greiner, 306 F.3d 1190, 1195 & n.1 (2002).

Because the New York Court of Appeals denied Stevens leave to amend his direct appeal

on May 7, 2012, and Stevens did not seek a writ of *certiorari* to the U.S. Supreme Court, his

conviction became final on August 6, 2012. Stevens had until August 6, 2013, to file his *habeas*

petition. Accordingly, Stevens's petition, filed July 24, 2013, is timely.

**II.     Exhaustion**

**A.      Statement of Law**

Before a federal court can review a petition for a writ of *habeas corpus*, a petitioner must

exhaust all state-provided remedies. 28 U.S.C. § 2254(b)(1)(A). See also O'Sullivan v. Boerckel,

526 U.S. 838, 845 (1999) (stating that, to exhaust a claim, a petitioner must "invoke[] one

complete round of the State's established appellate review process" before bringing the same

claim in federal court). A claim is deemed exhausted if the petitioner: (1) "fairly presented" to an

appropriate state court the same federal constitutional claim that he now urges upon the federal

20

courts; and (2) presented his claim to the highest state court that could hear it. Baldwin v. Reese, 541 U.S. 27, 29 (2004); O'Sullivan, 526 U.S. at 844-48.

To fairly present his claims, a petitioner may not rely solely on general principles of fairness, but instead must refer to specific constitutional provisions or concepts. See Reid v. Senkowski, 961 F.2d 374, 376 (2d Cir. 1992) (stating that minimal reference to the constitution satisfies the exhaustion requirement); see also de la Cruz v. Kelly, 648 F. Supp. 884, 888 (S.D.N.Y. 1986) (finding that the petitioner sufficiently alerted the state court of the constitutional aspect of his claims when he argued that the challenged ruling denied him a fair trial and cited the Fourteenth Amendment). The legal doctrine asserted in the state courts does not need to be identical to that raised in the *habeas* petition, but "the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." Daye v. Att'y Gen. of New York, 696 F.2d 186, 192 (2d Cir. 1982).

The Court of Appeals for the Second Circuit applies the "fair presentation" standard liberally, allowing that a state court may be deemed to be on notice of the constitutional nature of a claim even if the petitioner did not specifically quote the U.S. Constitution. Other ways that a petitioner may be found to have provided notice sufficiently include "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." Ramirez v. Att'y Gen. of New York, 280 F.3d 87, 94-95 (2d Cir. 2001) (citing Daye, 696 F.2d at 194). This position protects petitioners who rely on constitutional principles without citing "book and verse on the federal constitution," while ensuring that state courts have the opportunity to "pass upon and correct"

21

alleged violations of federal rights. Picard v. Connor, 404 U.S. 270, 275, 278 (1971) (internal

quotation marks and citations omitted).

### B.    Stevens's Claims

The respondent contends that Stevens has exhausted all but one of his claims. First, the

respondent concedes that Stevens exhausted his ineffective assistance of counsel claim under

Strickland v. Washington, noting that he raised this claim in his direct appeal brief and in his

application to the New York Court of Appeals for leave to appeal, which was denied. The Court

agrees that Stevens exhausted this claim. In his direct appeal, Stevens argued ineffective

assistance of counsel explicitly under Strickland and the Sixth Amendment. His application for

leave to appeal then asked the Court of Appeals "to review the question of whether the defendant

was deprived of the effective assistance of counsel under People v. Baldi, 54 N.Y.2d 137 (1981)

and Strickland v. Washington, 466 U.S. 668 (1984)." (Ex. Q at 117.) Because he was denied

leave to appeal, Stevens exhausted this claim.

Second, the respondent concedes that Stevens exhausted "his conflict of interest claims[,

which he raised] in federal constitutional terms in his second [§] 440 motion and leave

application to the appellate division." (Opp'n at 25.)[11] The respondent, however, argues that

Stevens's second § 440.10 motion did not exhaust his "actual conflict claim relating to his

finder's fee arrangement with Perez-Olivo," i.e., Stevens's role as "chaser" for Perez-Olivo. (Id.)

The respondent acknowledges that Stevens provided the facts of the chaser arrangement to the

state court, but argues that Stevens "identified only one adverse effect on counsel's trial

---

[11] With his application for leave to appeal the denial of his § 440.10 motion, Stevens fulfilled the
exhaustion requirement of presenting his claim to the highest state court that could hear it. On direct
appeal, the court considers only facts in the record; thus, Stevens was not required to raise the conflict-of-
interest claims, which are based primarily on facts outside the record, in his application for leave to
appeal to the Court of Appeals.

performance – namely, that the chasing arrangement 'meant that Perez-Olivo did not receive any actual money to represent [Stevens] and thus, [Perez-Olivo] had little or no incentive to put any real work into the case.'" (Id. at 27-28 (quoting Ex. H at 58).) The respondent notes that, in Stevens's *habeas* petition, he contends that Perez-Olivo "'had a vested interest in having petitioner remain incarcerated pending trial so that petitioner could keep referring him clients. If petitioner had posted bail, or if petitioner had taken a plea and was sent to prison upstate, then Perez-Olivo's gravy train would dry up.'" (Opp'n at 26 (quoting Pet. Mem. at 54).) The respondent characterizes Stevens's petition as arguing that, because of this conflict of interest created by the chaser arrangement, Perez-Olivo refused to try to persuade Stevens to take a seven-year plea offer. "Although the second [§] 440 motion mentioned counsel's alleged error in the plea negotiations," the respondent argues, "the motion did not claim that the plea error was caused by the conflict arising from the chasing arrangement"; thus, the claim is unexhausted. (Opp'n at 26.) The Court disagrees.

At the outset, the Court finds, and the respondent does not contest, that all of Stevens's claims in his § 440.10 motion were preserved in his application for leave to appeal, either in the principal brief (submitted in the form of an affirmation from Hoth) or in the § 440.10 motion itself, which was attached to the application as an exhibit and identified as containing the bases for granting leave to appeal. Accord Ramirez, 280 F.3d at 97 ("References to attached briefs without more will preserve issues only if the [appellate court] is clearly informed that the reference is asserting issues in those briefs as bases for granting leave to appeal."); Morgan v. Bennett, 204 F.3d 360, 369-71 (2d Cir. 2000); Acevedo v. Lempke, 10 Civ. 5285 (PAE)(HBP), 2013 WL 6988602, at *9-10 (S.D.N.Y. Oct. 24, 2013) report and recommendation adopted, 2014 WL 148601 (S.D.N.Y. Jan. 14, 2014).

23

It is undisputed that Stevens raised two conflict-of-interest theories in his § 440.10 motion: "*per se*" conflict of interest and "actual" conflict of interest. In the motion, Stevens cited authority from the Court of Appeals for the Second Circuit to support his claim that Perez-Olivo's criminal and fraudulent conduct during the trial constituted a *per se* conflict of interest, requiring an automatic reversal of the conviction. Thus, as the respondent admits, Stevens exhausted his claim of a *per se* conflict of interest.

The respondent does not contest that Stevens generally exhausted his claim of an actual conflict of interest, which, unlike a *per se* conflict of interest, requires a showing that the conflict of interest adversely affected the lawyer's performance. See United States v. Schwarz, 283 F.3d 76, 91 (2d Cir. 2002). Stevens straightforwardly argued in his § 440.10 motion that his constitutional rights were violated due to actual conflicts of interests raised by (1) Perez-Olivo's representation of Stevens while simultaneously committing or planning to commit acts of fraud against Stevens's wife, and (2) Perez-Olivo's representation of Stevens while accepting payment in the form of the chaser arrangement. Regarding the chaser conflict, the preliminary statement of the § 440.10 motion states that Stevens "was deprived of his state and federal right to the effective assistance of counsel under three separate theories," including that he "was denied his right to conflict free counsel when his trial counsel agreed to represent him in exchange for referral of other inmate/clients." (Ex. H at 46.) Stevens then provided the facts of the chaser arrangement, including his 10% finder's fee and his referral of between 10 and 13 clients to Perez-Olivo. He cited these facts to support his conclusion that Perez-Olivo "deprived [him] of his right to conflict-free representation." (Ex. H at 48.)

As discussed, Stevens also alleged multiple facts in his § 440.10 motion with respect to the pleas negotiations. Seven paragraphs of the Hoth Affirmation set forth the factual history of

the plea offers, including the allegations that Perez-Olivo "did nothing to persuade Mr. Stevens to accept the plea" and that Stevens refused to accept a plea "because Perez-Olivo had promised him that he would win the case." (Ex. H at 10.) Immediately after the paragraph in the memorandum of law alleging the facts of the chaser arrangement, Stevens argued, "Not surprisingly for an attorney focused on his own unjust enrichment, Perez-Olivo provided less than effective representation. Although Mr. Stevens was caught on videotape entering the building . . . and then leaving with a garbage bag, Perez-Olivo refused to try and convince Mr. Stevens to accept a plea offer . . . ." (Ex. H at 48.) Stevens also argued that the "[p]romises and claims" Perez-Olivo made to Stevens and his wife in order to bilk them out of their money "could not have been made if he had persuaded Mr. Stevens to plead guilty in exchange for a five year term."[12] (Ex. H at 59.)

The respondent argues that Stevens's § 440.10 motion did not submit the specific theory that Perez-Olivo provided poor representation at trial and with regard to the plea offers so that Stevens would remain in prison and continue acting as a chaser. A petitioner's federal constitutional claim has been fairly presented to the state courts where the petitioner "has informed those courts of 'all of the essential factual allegations' and 'essentially the same legal doctrine he asserts in his federal petition,'" though the asserted legal doctrine need not be identical. Strogov v. Att'y Gen. of New York, 191 F.3d 188, 191 (2d Cir. 1999) (quoting Daye, 696 F.2d at 191-92). All of the factual allegations in Stevens's *habeas* petition regarding the chaser arrangement, the plea offers, and the subsequent trial errors also appear in Stevens's § 440.10 motion. And the same legal doctrine is plainly asserted in both filings: Stevens was

---

[12] Given the facts alleged in the Hoth Affirmation, Stevens likely intended to refer to the seven-year plea offer, not the five-year offer that Stevens may have accepted before it was withdrawn.

deprived of his Sixth Amendment right to the effective assistance of counsel due to Perez-Olivo's actual conflicts of interest, one of which arose from the chaser arrangement.

Stevens employed the same analytical framework in his § 440.10 motion that he does in his *habeas* petition: (1) he alleges that Perez-Olivo financially benefited from the chaser agreement and from swindling Stevens's wife; (2) he alleges that Perez-Olivo provided deficient representation; and (3) he draws the inference that Perez-Olivo's deficient representation was intended to advance the two schemes from which he financially benefited. The respondent essentially argues that Stevens must have explicitly applied this formula to every alleged fact of Perez-Olivo's deficient representation in order for an argument based on that fact to be exhausted. This contention is insupportable and would not serve the purpose of exhaustion, which is to ensure that the state court was presented with the same facts as the federal court and alerted to the constitutional nature of the claims. Claims, not speculative theories based on claims, must be exhausted. While overtly drawing the inference to connect each fact to the constitutional violation it supports might be good practice, it is not required for exhaustion. It is clear that Stevens, in his state court § 440.10 motion and in his federal *habeas* petition, presented the same factual allegations regarding the plea offers and the chaser arrangement, and presented essentially the same legal doctrine of Sixth Amendment deprivation based on counsel's actual conflict of interest. The Court therefore finds that Stevens sufficiently exhausted all claims asserted in his *habeas* petition.

## III.    Merits Review

### A.    Standard of Review

After exhaustion, but before a federal court can issue a writ of *habeas corpus*, a petition must satisfy a "difficult to meet[] . . . and highly deferential standard for evaluating state-court

rulings, which demands that state-court decisions be given the benefit of the doubt." <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1398 (2011) (citations and internal quotation marks omitted). Under the AEDPA, *habeas* relief may be granted only when the state court's decision:

(1) Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court 'applied a rule that contradicts' that precedent, or reached a different result than the Supreme Court on facts that are 'materially indistinguishable.'" <u>Mannix v. Phillips</u>, 619 F.3d 187, 195 (2d Cir. 2010) (internal alterations omitted) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000)). As long as the state court decision applied the correct legal rule to the facts of a petitioner's case, it is not subject to *habeas* review, even if the federal court would have reached a different conclusion if it were to apply the rule itself. <u>Williams</u>, 529 U.S. at 406.

A state court's decision involves an "unreasonable application" of clearly established federal law if the court identified the legal rule set forth in governing Supreme Court cases, but unreasonably applied the rule to the facts of the case. <u>Id.</u> at 407-08. A federal court may grant *habeas* relief only when the state court's decision, as it pertains to any issue of federal law, was "objectively unreasonable" in light of relevant precedent; thus, in construing and applying federal law, even erroneous state court decisions, if deemed reasonable, will survive *habeas* review. <u>Id.</u> at 409-13; <u>see also</u> <u>Besser v. Walsh</u>, 601 F.3d 163, 178 (2d Cir. 2010) ("The proper inquiry is not whether a state court's application of, or refusal to extend, the governing law was erroneous, but whether it was 'objectively unreasonable.'") (quoting <u>Williams</u>, 529 U.S. at 409-

10). "[W]hen a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court precedent." Sellan v. Kuhlman, 261 F.3d 303, 311-12 (2d Cir. 2001). For federal *habeas* review, factual determinations made by a state court are presumed correct, and a petitioner bears the burden of rebutting this presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## B.    Sixth Amendment Ineffective Assistance of Counsel

### 1.    Statement of Law

#### a.    Ineffective Assistance Under Strickland v. Washington

Criminal defendants have the right to the effective assistance of counsel under the Sixth Amendment to the U.S. Constitution. For the purposes of reviewing a *habeas* petition under 28 U.S.C. § 2254(d)(1), Strickland v. Washington, 466 U.S. 668 (1984), is the applicable "clearly established Federal law" with which to assess an ineffective assistance of counsel claim. Cullen, 131 S. Ct. at 1403; Harrington v. Richter, 131 S. Ct. 770, 785 (2011); Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006).

Evaluation of an ineffective assistance claim on *habeas* review is rooted in the two-pronged test articulated in Strickland. See Harrington,131 S. Ct. at 785 (stating that, in a *habeas* petition based on ineffective assistance of counsel, the federal court reviews whether the state court's decision "involved an unreasonable application of" Strickland). The first prong considers whether counsel's performance was objectively unreasonable, maintaining that any errors must be "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Strickland, 466 U.S. at 687. This performance is to be judged by an objective

standard of reasonableness. Id. at 688. "[S]trategic choices made after thorough investigation of law and fact relevant to plausible options are virtually unchallengeable." Id. at 690. When reviewing a claim under Strickland, courts apply a "strong presumption of attorney competence." Kimmelman v. Morrison, 477 U.S. 365, 383-84 (1986); see also Yarborough v. Gentry, 540 U.S. 1, 8 (2003) (stating that there is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect"); Michel v. Louisiana, 350 U.S. 91, 101 (1955) (stating that, when reviewing a *habeas* petitioner's claim of ineffective assistance, counsel's conduct is presumptively "sound trial strategy"); Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) ("Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance.") (citations and internal quotations marks omitted). The petitioner has the burden of proving "that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." Kimmelman, 477 U.S. at 381.

Under Strickland's second prong, a petitioner must establish that he suffered prejudice as a result of his counsel's deficient performance. Strickland, 466 U.S. at 687. To satisfy this burden, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; see Hinton v. Alabama, 571 U.S. ___, 2014 WL 684015, at *6 (February 24, 2014). "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding' . . . . Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Harrington, 131 S. Ct. at 787-88 (quoting Strickland, 446 U.S. at 693, 687).

A petitioner must satisfy both prongs to be granted relief, and courts may deny a petition upon an adverse finding on either prong. Strickland, 466 U.S. at 697 ("[T]here is no reason for a

court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."). Courts assess claims of ineffective assistance of counsel by "consider[ing] the totality of the evidence before the judge or jury." Id. at 695; see Pavel v. Hollins, 261 F.3d 210, 216 (2d Cir. 2001) (considering the "*cumulative* weight of [defense counsel's] flaws [on the petitioner's] Sixth Amendment rights) (emphasis in original).

"Surmounting Strickland's high bar is never an easy task." Harrington, 131 S. Ct. at 778 (internal quotation marks omitted). Rigorous and "highly deferential," Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001), the Strickland standard seeks to avoid the "distorting effects of hindsight," Strickland, 466 U.S. at 689. These principles, however, "do not establish mechanical rules." Strickland, 466 U.S. at 696. A court's inquiry should focus on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process. Id.

A petitioner who brings a *habeas* claim based on ineffective assistance of counsel under the Sixth Amendment has a higher burden than a defendant on direct appeal raising those same claims. Harrington, 131 S. Ct. at 785. "The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard." Id; see Sellan, 261 F.3d at 315 (stating that an objectively unreasonable application involves "[s]ome increment of incorrectness beyond error"). Indeed, "[f]ederal *habeas* courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d)." Harrington, 131 S. Ct. at 788; see Knowles v. Mirzayance, 556 U.S. 111, 112, 124 (2009) (stating that, when the "highly deferential" standards created by Strickland and § 2254(d) are applied in tandem, the

review is "doubly" deferential). Under this highly deferential standard, federal *habeas* relief is precluded if "fairminded jurists could disagree" on the correctness of the state court's decision. Harrington, 131 S. Ct. at 786.

### b.    Ineffective Assistance Based on Conflicts of Interest

The Supreme Court held in Cuyler v. Sullivan, 446 U.S. 335 (1980), and reaffirmed in Strickland, that a criminal defendant can show ineffective assistance of counsel in violation of the Sixth Amendment by "demonstrat[ing] that an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. at 348; Strickland, 466 U.S. at 686 (stating that an "actual conflict of interest adversely affecting [a] lawyer's performance renders assistance ineffective"). A court will presume prejudice if the petitioner satisfies his burden of showing, first, that his counsel "'actively represented conflicting interests'" during the course of the representation, and, second, that the conflict of interest adversely affected his counsel's performance. Strickland, 466 U.S. at 692 (quoting Cuyler, 446 U.S. at 350); see Mickens v. Taylor, 535 U.S. 162, 173-74 (2002); Burger v. Kemp, 483 U.S. 776, 783 (1987) (stating that a single lawyer jointly representing two criminal co-defendants creates a *possible* conflict of interest, but that a petitioner must show that his trial lawyer 'actively represented conflicting interests' to raise an *actual* conflict of interest, and must then show that this actual conflict 'adversely affected his lawyer's performance' in order for a court to presume prejudice) (quoting Strickland, 466 U.S. at 692).

### 2.    Stevens's *Per Se* Conflict of Interest Claim

In his petition, Stevens argues,

> The depth and scope of Perez-Olivo's illegal and unethical activities is astounding and his misconduct was so pervasive that it leached the integrity out of the criminal proceedings. Petitioner was a victim of Perez-Olivo's fraud and deception, not a client benefitting from his representation. . . . Accordingly, under

31

the unique facts of this case, petitioner is entitled to *per se* reversal of his conviction because he was denied the representation of legitimate, conflict-free counsel throughout the pendency of his criminal case.

(Pet. Mem. at 55.)

To support this argument, Stevens cites authority from the Court of Appeals for the Second Circuit, which he states "has identified two situations that create per se violations," neither of which, he concedes, describe his situation. (Id. at 52 (citing United States v. Williams, 372 F.3d 96, 102 (2d Cir. 2004)).) Courts in the Second Circuit have found a *per se* conflict of interest, requiring automatic reversal of the conviction, only where a criminal defendant was represented by a person unauthorized to practice law, or where trial counsel was implicated in the same crime for which his client was on trial. See, e.g., Williams, 372 F.3d at 103; Elfgeeh v. United States, 681 F.3d 89, 93 (2d Cir. 2012) (finding that the first category includes "representation by an individual who, before the representation in question, has been disbarred in all jurisdictions where he or she was once admitted"); Tippins v. Walker, 77 F.3d 682, 686 (2d Cir. 1996) (stating that the *per se* doctrine has been applied in these two situations "without enthusiasm" and that "[w]e are reluctant to extend a rule of *per se* prejudice in any new direction") (internal quotation marks omitted). Stevens relies exclusively on United States v. Aiello, 900 F.2d 528 (2d Cir. 1990), which appears to be the only Court of Appeals authority recognizing that a *per se* conflict of interest can theoretically exist in egregious circumstances outside of the two traditionally recognized categories.

The Court's analysis of Stevens's *per se* claim need not go further. The Supreme Court has never adopted the above *per se* conflict of interest framework or announced the rule that a petitioner in certain circumstances need not show that his counsel's conflict of interest adversely affected the counsel's performance. Cf. Mickens, 535 U.S. at 173-74. "[T]he Supreme Court has

made clear that the phrase 'clearly established Federal law' refers to holdings . . . of cases decided by the Supreme Court, as opposed to lower federal courts." Evans v. Fischer, 712 F.3d 125, 133 (2d Cir. 2013) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)); see also Renico v. Lett, 559 U.S. 766, 779 (2010) (holding that a decision issued by a federal court of appeals "does not constitute 'clearly established Federal law, as determined by the Supreme Court,' . . . , so any failure to apply that decision cannot independently authorize *habeas* relief under AEDPA"). The Second Circuit Court of Appeals' finding that its "*per se* ineffectiveness rule gives the most rational meaning to the Sixth Amendment's right to the assistance of counsel" cannot be applied under the AEDPA standard. Elfgeeh, 681 F.3d at 93. See Rodriguez v. Miller, 537 F.3d 102, 109 (2d Cir. 2008) (stating that, because of recent Supreme Court opinions, the Court of Appeals can no longer rely "on our own precedents to interpret and flesh out Supreme Court decisions to decide variegated [*habeas*] petitions as they come before us"). Indeed, analyzing the state courts' decisions with reference to the *per se* conflict of interest doctrine would be to proceed "on the mistaken belief that circuit precedent may be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced." Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013). "The error in this approach is subtle, yet substantial." Id. Therefore, Stevens's *per se* conflict of interest claim fails because it has no basis in clearly established Supreme Court law.

### 3.  Stevens's Actual Conflict of Interest Claim

For the Court to grant Stevens *habeas* relief on his actual conflict of interest claim, the Court must first find that Perez-Olivo actively represented interests during the trial that conflicted with Stevens's interests, and that these conflicting interests harmed Perez-Olivo's advocacy. See Burger, 483 U.S. at 783. If the Court finds that Stevens sufficiently demonstrated

that an actual conflict of interest adversely affected Perez-Olivo's performance, the Court must then determine whether the state court's denial of the § 440.10 motion as to this claim was an unreasonable application of clearly established Supreme Court law. If "fairminded jurists could disagree" on the correctness of the state court's denial, then it was not unreasonable and *habeas* relief cannot be granted. Harrington, 131 S. Ct. at 786.

Outside the context of a lawyer representing multiple co-defendants, the Supreme Court has provided little, if any, guidance as to possible grounds for an actual conflict of interest. See Corniel v. N.Y.S. Div. of Parole, 04 Civ. 2577 (KMW)(RLE), 2007 WL 1649895, at *8 (S.D.N.Y. June 6, 2007) (finding that, because the Supreme Court has not extended the presumption of prejudice standard "beyond the context of 'multiple concurrent representation,'" application of the presumption of prejudice to other bases for a conflict of interest "is not clearly established federal law") (quoting Mickens, 535 U.S. at 174-75).

Stevens contends that Perez-Olivo had an actual conflict of interest due to, first, his chaser arrangement with Stevens, and, second, his involvement in the sale of Mrs. Stevens's house and his fraudulent acts committed against her. As to this first ground, Stevens alleges that, in lieu of paying Perez-Olivo directly for legal services, he agreed to act as Perez-Olivo's chaser, referring potential clients to him in exchange for a 10% finder's fee. This arrangement was clearly improper. Paying someone in exchange for client referrals is a violation of the New York Code of Professional Responsibility, and paying the criminal defendant you are representing at trial for such referrals is particularly egregious. See N.Y. Rules of Prof. Conduct, Rule 7.2; In re Gruen, 863 N.Y.S.2d 733, 735-36 (2d Dep't 2008). Nevertheless, Stevens fails to demonstrate that these facts created an actual conflict of interest under clearly established Supreme Court law. To the extent Stevens argues that the chaser arrangement pitted Perez-Olivo's monetary interests

34

against Stevens's interests at trial, such a conflict does not constitute an actual conflict of interest triggering a presumption of prejudice under clearly established law as determined by the Supreme Court. See Washington v. Brown, 09 Civ. 544 (JG), 2009 WL 1605553, at *7 (E.D.N.Y. June 8, 2009) (stating that "the Supreme Court has never applied its 'actual conflict of interest' jurisprudence in the context of a lawyer providing shoddy representation to further his own financial interests" and finding that, because there is a circuit split on the issue, the state court could reasonably have analyzed the "conflict of interest" claim under the Strickland standard for ineffective assistance of counsel).

Alternatively, assuming *arguendo* that this Court could apply federal law as established in the Second Circuit, Stevens's evidence would fall short of showing that an actual conflict of interest resulted from the chaser arrangement. The Court of Appeals for the Second Circuit has held that an actual conflict of interest may arise where a criminal defendant's "interests in effective representation were pitted against trial counsel's monetary interest." Winkler v. Keane, 7 F.3d 304, 307 (2d Cir. 1993) (finding that an actual conflict of interest arose from a criminal defense lawyer's contingency fee based on specific trial outcomes). Financial conflicts, however, are less likely to be considered actual conflicts of interest because of the "presumption . . . that the lawyer will subordinate his pecuniary interests and honor his primary professional responsibility to his client[ ] in the matter at hand." United States v. O'Neil, 118 F.3d 65, 71 (2d Cir. 1997) (internal quotation marks omitted, second alteration in original). Stevens's position – that Perez-Olivo intentionally performed poorly at trial so Stevens would remain imprisoned and refer more prisoner-clients to Perez-Olivo – is unsupported by evidence and is logically untenable. The proposition that it would be financially beneficial for a criminal defense lawyer to provide ineffective assistance at trial in order to gain a small number of prisoners as clients is

35

dubious. Unlike with the contingency fee at issue in Winkler, it is purely speculative that the chaser agreement would provide any financial incentive for Perez-Olivo to make certain trial decisions. Stevens's claim relies on two unsupported layers of speculation: that the chaser arrangement would make forfeiting the trial financially beneficial for Perez-Olivo, and that Perez-Olivo actively represented his interest in capitalizing on the chaser arrangement during the trial. Such speculation is insufficient for Stevens to show an actual conflict of interest with respect to the chaser arrangement and Perez-Olivo's performance at trial. Cf.  United States v. Berger, 188 F. Supp. 2d 307, 333 (S.D.N.Y. 2002) (quoting Triana v. United States, 205 F.3d 36, 40 (2d Cir. 2000)) (stating that, where a petitioner asserts a conflict of interest claim, the petitioner's "burden of proof 'cannot be met by speculative assertions of bias or prejudice'"); Eisemann v. Herbert, 401 F.3d 102, 109 n.3 (2d Cir. 2005) (rejecting the claim that defense counsel failed to call a witness due to his conflicting interest in concealing his own fraud as "highly speculative"); Petrucelli v. United States, 05 Civ. 9582 (TPG), 2009 WL 4858081, at *9 (S.D.N.Y. Dec. 15, 2009) (finding that a petitioner's claim that his lawyer advised him not to testify due to the lawyer's conflicting interest in not being implicated in a crime "is entirely speculative and has no substance").

Stevens's claim that Perez-Olivo sought to continue the chaser relationship by not trying to persuade Stevens to accept a plea bargain may be more logically coherent, as Stevens would have no reason to act as a chaser after accepting a plea bargain, but it is just as legally untenable. Stevens fails to allege, much less establish, any specific facts about Perez-Olivo's conduct with respect to the plea offers. And the evidence presented here and to the state court on this issue is not only exceedingly ambiguous, it directly contradicts the claim that Perez-Olivo acted against Stevens's interests. According to the Hoth Affirmation, Stevens was offered a plea bargain of

three years, which was retracted, and then five years, which Stevens agreed to take but which was later retracted, and then either seven years (according to Perez-Olivo) or twelve years (according to Stevens), which Stevens rejected. Further confusing the matter, despite having agreed to a five-year plea bargain, Stevens "refused to accept any offer higher than three years"; and, despite allegedly attempting to prevent a plea bargain to serve his own financial interests, Perez-Olivo tried to convince the prosecution "to agree to a plea down," and he did not impede Stevens's acceptance of a five-year plea offer. (Ex. H at 9-10.) In addition to being highly convoluted, this evidence can reasonably be found to undermine Stevens's conflict of interest claim because it may show that, first, Perez-Olivo did not prevent Stevens from accepting a plea offer and in fact advocated for a "plea down"; and, second, Stevens rejected the plea offers because he did not want to accept anything higher than the initial offers that the prosecutor withdrew, not because of any actions taken or promises made by Perez-Olivo. Therefore, were the Court to apply the law in the Second Circuit, Stevens's evidence would be plainly insufficient for him to carry his burden of showing an actual conflict of interest as to the chaser arrangement and the plea negotiations.

Stevens's allegation that Perez-Olivo intentionally forfeited the trial to facilitate his swindling of Stevens's wife would fare no better under Court of Appeals precedent. Stevens submitted no evidence to the state court that shows any possible conflict of interest arising until after Stevens was convicted and sentenced. The evidence Stevens has presented indicates that Perez-Olivo illegally and egregiously defrauded Stevens and his wife out of their savings. But there is no evidence that any of this misconduct occurred during or leading up to the trial, or that an actual conflict of interest arose during that period. The only dates Stevens provided are for the deposits Mrs. Stevens made into Perez-Olivo's bank accounts, and these dates occur several

37

months after Stevens was convicted and sentenced. The one event that Stevens alleged actually occurred during the trial was that Perez-Olivo learned that Mrs. Stevens had a home that was in foreclosure. Stevens implies that Perez-Olivo facilitated the sale of the home during the course of the trial, but, in addition to presenting no evidence of this, Perez-Olivo stated during Stevens's sentencing hearing that the house was still in foreclosure. Stevens's argument is premised on the unavailing speculation that Perez-Olivo's acts after Stevens's conviction are evidence of his conflict of interest before the conviction. There is a strong presumption that an attorney's conduct at trial is reasonable. See Kimmelman, 477 U.S. at 383-84. The evidence here, while certainly undermining any presumption one might have about Perez-Olivo's ethics and character, does not rebut the presumption that Perez-Olivo's trial decisions were based on sound strategy, rather than a desire to set the stage for later criminal activity. A Sixth Amendment violation under Cuyler v. Sullivan must be based on more than an "attenuated hypothesis" or a "theoretical or merely speculative conflict of interest." Bucuvalas v. United States, 98 F.3d 652, 657 (1st Cir. 1996) (internal quotation marks and citations omitted); see also Triana, 205 F.3d at 40; Eisemann, 401 F.3d at 109 n.3. With no evidence that Perez-Olivo took any action in furtherance of defrauding Mrs. Stevens during Stevens's trial, Stevens's could not satisfy his burden of showing an actual conflict of interest under the law of the Court of Appeals.

To the extent that Stevens submits Perez-Olivo's misconduct as to other clients or his 2008 murder conviction as evidence of a conflict of interest, such evidence has no connection to Stevens's trial and is plainly unavailing. Similarly, Stevens cannot show that an actual conflict of interest arose because Perez-Olivo would have faced criminal charges or disciplinary actions as a consequence of his conduct related to his representation of Stevens. His argument as to this ground misstates the law established by the Court of Appeals, which has held that an actual

conflict of interest may arise where an attorney's involvement in crimes related to the defendant's trial may be revealed in trial testimony, thus influencing the attorney's trial decisions in order to avoid self-incrimination. See United States v. Levy, 25 F.3d 146, 156-57 (2d Cir. 1994) (collecting cases). Stevens does not argue, and there is no basis to infer, that there was ever a risk that evidence of the chaser arrangement or Perez-Olivo's alleged plans to defraud Mrs. Stevens would be elicited during Stevens's burglary trial. Stevens's argument on this ground would thus fail under the law established by the Court of Appeals.

The state court's denial of Stevens's actual conflict of interest claims was not an unreasonable application of clearly established Supreme Court law. Additionally, were the Court to apply the law of the Court of Appeals for the Second Circuit governing financial conflicts of interest, Stevens would still fail to show an actual conflict of interest as to any of his asserted grounds.

### 4.      Ineffective Assistance of Counsel Under Strickland

In his second § 440.10 motion, direct appeal, and this *habeas* petition, Stevens claims that he was deprived of his Sixth Amendment right to effective assistance of counsel under the Strickland standard because of the cumulative effect of Perez-Olivo's following three errors: (1) opening the door to the underlying facts of Stevens's prior felony convictions; (2) failing to conduct an adequate investigation into the facts of Stevens's defense that he went to the apartment building on December 12, 2004, to remove the garbage; and (3) waiving the suppression hearing. The New York Supreme Court and the Court of Appeals denied Stevens's ineffective assistance claims under the federal Strickland standard and under the New York standard. The Court must assess whether Stevens carried his burden in the state courts by rebutting the presumption that the three identified "errors" were sound trial strategy and showing

that the errors were in fact objectively unreasonable, resulting in prejudice. See Kimmelman, 477 U.S. at 381; Williams, 529 U.S. at 409-13. If Stevens did successfully make such a showing, the Court must then determine whether the state courts' decisions finding otherwise were nonetheless reasonable applications of clearly established Supreme Court law.

### a.    Opening the Door to Stevens's Prior Convictions

At the pre-trial Sandoval hearing, Justice Wiley prohibited the prosecutor from inquiring into the facts of Stevens's prior drug-related felony convictions other than to elicit information about the name of the felony and the fact that it was a felony. At trial, Perez-Olivo asked Stevens about his prior felony convictions, apparently including some that were entirely precluded by the court at the Sandoval hearing. Perez-Olivo specifically inquired into the underlying facts of each felony conviction. These questions primarily established facts about Stevens's history as a drug addict and about the circumstances of his attempted robbery conviction, including Stevens's use of force against a police officer before realizing he was a police officer. At the conclusion of Perez-Olivo's direct examination of Stevens, Justice Wiley told the prosecutor that she may inquire into the underlying facts of Stevens's convictions on cross-examination because Stevens had opened the door to such questions through his direct testimony.

A defense attorney's decision to open the door to evidence of the defendant's criminal history can be found objectively unreasonable under Strickland. See Wilson v. Mazzuca, 570 F.3d 490, 505 (2d Cir. 2009) (finding it "objectively unreasonable" for defense counsel to elicit reputation testimony regarding the defendant, who was on trial for robbery, thus opening the door to the admission of the defendant's criminal history, which included convictions for drug possession and "punching a woman and taking her necklace"). Stevens, however, does not show that Perez-Olivo's decision here allowing the introduction of certain facts was objectively

unreasonable. Unlike in Wilson v. Mazzuca, on which Stevens relies in his petition, Stevens's prior felony convictions were already deemed permissible subjects for cross-examination. These convictions included multiple instances of selling drugs and one instance of attempted robbery. In Wilson, the defense attorney opened the door during a robbery trial to evidence showing that the defendant had been convicted of violently stealing a necklace, a fact that would have been precluded from the trial but for defense counsel's decision. Here, it appears that, because the prosecutor was clearly going to elicit on cross-examination the fact that Stevens had been convicted of attempted robbery, a charge similar to burglary, Perez-Olivo decided to first elicit facts that would frame the attempted robbery in a less damaging light. Indeed, Stevens's testimony that he was trying to defend a bicycle he considered to be his from a man whom he thought was stealing it could reasonably be considered less damaging than leaving the facts of the attempted robbery conviction to the jury's imagination. And, while this testimony included the fact that Stevens used force against a police officer, this testimony was necessary to explain the robbery conviction and was mitigated by Stevens's statement that he stopped using force once he realized the man taking the bicycle was a police officer.

With respect to the convictions for selling drugs, Perez-Olivo established that each of the underlying acts was committed when Stevens was struggling with drug addiction. Not only did Perez-Olivo show that Stevens overcame his drug addiction while in prison, but he established that Stevens took steps toward becoming a productive member of society, culminating in Stevens's running an addiction counseling group and earning a legitimate living by performing various tasks for Mazzaraco and the managers of different businesses and buildings in New York City. Thus, Perez-Olivo's inquiries into the drug-related convictions likely suggested to the jury that Stevens's past criminal acts were entirely correlated to his drug addiction. And, at the time

41

of the charged burglary, Stevens had been sober for several years, was helping others overcome their addictions, was a husband and father, and was working legitimate jobs. Perez-Olivo did open the door to certain facts that could only be viewed negatively – e.g., one of Stevens's convictions was for selling drugs near a school and Stevens was also convicted of resisting arrest. But none of the facts elicited is clearly so damaging as to render Perez-Olivo's strategy of establishing Stevens's rehabilitation narrative and minimizing the relevance of Stevens's past convictions objectively unreasonable. Thus, Perez-Olivo's inquiry into Stevens's prior convictions, which opened the door to otherwise precluded facts, was not objectively unreasonable under Strickland.

### b.    Failure to Conduct an Adequate Investigation

A criminal defense attorney's representation may be found ineffective where the attorney did not perform his "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691; see Wiggins v. Smith, 539 U.S. 510, 521-22 (2003); Hinton, 2014 WL 684015, at *6 ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland."). The only evidence Stevens provides to support his assertion that Perez-Olivo failed to conduct an adequate investigation is his own trial testimony. Stevens argues that if Perez-Olivo had adequately investigated, he would have gained "knowledge of the actual date of the garbage removal[, which] could have and should have caused a change in strategy." (Pet. Mem. At 64.) Stevens fails to show that Perez-Olivo did not conduct an adequate factual investigation.

Stevens testified that he was removing the garbage from the apartment building at 4:30 a.m. on Sunday. He further testified that he did not know that buildings in New York City are not

permitted to put garbage on the curb until Sunday night. In his summation, Perez-Olivo attempted to explain the possible discrepancy by saying that building superintendents do not always comply with city codes and that it is likely not uncommon for them to have the garbage taken out to the curb earlier than technically permitted. Stevens does not state how prior knowledge of the city's garbage regulations would have changed his and Perez-Olivo's trial strategy. If Stevens's argument is that such prior knowledge would have allowed him to change the facts to which he testified, such an argument would plainly be unavailing. See Nix v. Whiteside, 475 U.S. 157, 158 (1986) ("The Sixth Amendment right of a criminal defendant to assistance of counsel is not violated when an attorney refuses to cooperate with the defendant in presenting perjured testimony at his trial."). While prior knowledge would have helped Stevens anticipate and not get flustered by the prosecutor's question, it is not clear what alternative trial strategy this knowledge could have led to other than Stevens not taking the stand in the first place (a decision that Stevens has not challenged). Further, Stevens testified that he met with Perez-Olivo for several hours multiple times per week in the months leading up to trial, thus undermining his claim that Perez-Olivo failed to investigate adequately the factual basis of his defense. The Court presumes that Perez-Olivo performed competently, which includes conducting a reasonable pre-trial investigation. Stevens fails to rebut this presumption and show that Perez-Olivo's actions were objectively unreasonable.

### c.     Waiver of the Suppression Hearing

Stevens offers no argument to contradict Perez-Olivo's belief that the motion to suppress made by Stevens's initial counsel was either meritless or, given Stevens's anticipated testimony and defense, moot. It is well established that "failure to make a meritless argument does not amount to ineffective assistance." United States v. Regalado, 518 F.3d 143, 149 n.3 (2d Cir.

2008) (internal quotation marks omitted). There does not appear to be any credible evidence indicating that a motion to suppress Stevens's statements given voluntarily to the police would have been successful.[13] And, there was no reason to try to suppress Stevens's hat given that his entire defense relied on the assertion that he is the man on the videotape, but that he did not enter the building with the intent to commit burglary. With respect to the screwdriver, which was never alleged to have played any role in the burglary, Stevens does not articulate a basis for why it would have been suppressed, and it appears that Perez-Olivo mitigated the damage the evidence may have been caused by eliciting Mazzaraco's testimony justifying Stevens's possession of the tool. The evidence indicates that Perez-Olivo's decision to waive the suppression hearing was a strategic choice and therefore not unreasonable. Cf. Hinton, 2014 WL 684015, at *6 (finding that a lawyer's failure to seek additional funds to hire an expert witness was "unreasonable . . . where that failure was based not on any strategic choice but on a mistaken belief [of the law]").

The only specific assertion Stevens makes as to this alleged error is that, even if the motion to suppress were unsuccessful, Perez-Olivo could have still learned about Stevens's alleged statement to another prisoner in the precinct holding cell. In addition to this contention being entirely speculative, Perez-Olivo successfully objected to the prosecutor's eliciting of that statement at trial and thus had notice of the statement anyway. Most importantly, it is plainly not objectively unreasonable for an attorney to decline to use a suppression hearing for the improper purpose of obtaining discovery from the opposing party. Cf. People v. Peterkin, 543 N.Y.S.2d 438 (1st Dep't 1989) (stating that a criminal defendant must not be permitted "to subvert the

---

[13] Stevens seems to have abandoned his claim after the trial that Detective Sias forged his signature on the Miranda warnings.

purpose of a suppression hearing, which is to examine the legality of police conduct, and convert it into a vehicle for pretrial discovery"). Thus, Stevens has not shown that it was objectively unreasonable for Perez-Olivo to waive the suppression hearing.

The Court agrees with the state court's finding that Stevens fails to show that Perez-Olivo's trial decisions, including the three "errors" Stevens identifies, were objectively unreasonable when considered either individually or collectively. Tellingly, at no point in his petition does Stevens articulate preferable alternatives to Perez-Olivo's allegedly erroneous decisions. This is likely because, as found by both the New York Supreme Court and Court of Appeals, Stevens's guilt was proved with "overwhelming evidence." The Court agrees that Perez-Olivo's decisions are particularly reasonable in light of the strength of the prosecution's evidence and the absence of any alternative trial strategies that would have fared better. Therefore, because Stevens did not satisfy his burden under the first prong of Strickland of showing that Perez-Olivo performed below an objective standard of reasonableness, the state courts' denials of Stevens's ineffective assistance claim were not unreasonable applications of the law clearly established by the Supreme Court in Strickland.

### d.      Prejudice

Upon considering the totality of the evidence presented to the jury, it is apparent that, had Stevens successfully shown that any of Perez-Olivo's alleged errors were objectively unreasonable, he would have nonetheless been unable to demonstrate that he suffered prejudice as a result. The state's evidence was overwhelmingly strong. Stevens and McClain were captured by a surveillance camera entering an apartment building at 4:30 a.m., going to the basement, and leaving with various items, including the drill that Pepic would report as stolen. Even if Stevens did not concede it was him in the videotape, he would have been positively identified by the

fingerprints he left in the basement. Stevens signed a written statement confessing that, after McClain asked him if he wanted to make some money, they went to the apartment building, McClain retrieved the drill from the basement, and they together sold the drill. Parts of Stevens's written statement, such as his assertion that only McClain went to the basement, are directly contradicted by the videotape evidence and the fingerprints. On top of this, Stevens's trial testimony was inconsistent and not credible. Stevens further failed to identify in his state court motions or his *habeas* petition any specific alternatives to the decisions made by Perez-Olivo. Thus, Stevens did not satisfy his burden under <u>Strickland</u>'s second prong of demonstrating a reasonable probability that the result of his trial would have been different if not for Perez-Olivo's allegedly unreasonable errors. Nor are any of Perez-Olivo's decisions responsible for Stevens receiving the maximum sentence, which Justice Wiley issued on the grounds that Stevens was a second violent felony offender, had an extensive criminal history, and repeatedly lied under oath. Justice Wiley would have made the first two findings, and almost certainly would have made the third finding, irrespective of Perez-Olivo's three allegedly unreasonable decisions.

Stevens's Sixth Amendment ineffective assistance claim fails under both prongs of <u>Strickland</u>. Therefore, the state courts' denials of Stevens's claim, whether based on the first or second prong under <u>Strickland</u>, were not unreasonable applications of the law clearly established by the Supreme Court.

Because Stevens has failed to show that he is entitled to relief under 28 U.S.C. § 2254 on any of his asserted claims, the Court recommends that Stevens's *habeas* petition be DENIED in its entirety.

## CONCLUSION

For these reasons, I recommend that Stevens's petition for a writ of *habeas corpus* be DENIED as to all claims. Because Stevens has not made a substantial showing of the denial of a constitutional right, I recommend that no certificate of appealability be issued. See 28 U.S.C. § 2253(c)(2); Lucidore v. N.Y.S. Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000).

I further recommend that the Court certify, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from its order would not be taken in good faith and, therefore, that *in forma pauperis* status be denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

\*     \*     \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard J. Sullivan at the United States Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Sullivan. The failure to file these timely objections will result in a waiver of

47

those objections for purposes of appeal. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72(b); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge


DATED:      New York, New York
            March 4, 2014

48